# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES MOWRY, Individually and on behalf of all others similarly situated, | § § § § | Case No._____ |
| Plaintiff, | § § § | CLASS ACTION |
| v. | § § § | CLASS ACTION COMPLAINT FOR: |
| THE MEET GROUP, INC., JEAN CLIFTON, GEOFFREY COOK, CHRISTOPHER FRALIC, SPENCER RHODES, KEITH RICHMAN, BEDI SINGH, JASON WHITT | § § § § § § | (1) Breach of Fiduciary Duties; (2) Aiding and Abetting Breach of Fiduciary Duties; (3) Violation of § 14(a) of the Securities Exchange Act of 1934; |
| Defendants. | § § § | (4) Violation of § 20(a) of the Securities Exchange Act of 1934 |
| | § § § § | |
| | § | **JURY TRIAL DEMANDED** |

Plaintiff Charles Mowry ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this shareholder class action on behalf of himself and all other public shareholders of The Meet Group, Inc. ("Meet Group" or the "Company") against Meet Group, and its Board of Directors (the "Board" or the "Individual Defendants," and collectively with Meet Group, the "Defendants"), for breaches of fiduciary duties and violation of sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") in conjunction with the proposed buyout and acquisition of Meet Group by eHarmony Holding, Inc., NCG -

NUCOM GROUP SE, and Holly Merger Sub, Inc. (collectively, "NuCom Group"). The March 5, 2020 Merger Agreement provides for a business combination whereby the Merger Sub will be merged with and into NuCom Group. As a result of the Merger (defined below), the separate corporate existence of the Merger Sub will cease and Meet Group will continue as the surviving corporation. On the date of the closing of the Merger, Meet Group will become a wholly owned subsidiary of NuCom Group.

2.      Upon consummation of the Merger, each outstanding share of Meet Group common stock will be converted into the right to receive $6.30 in cash, without interest (the "Per Share Merger Consideration"). According to the Merger Agreement, all shares converted into the right to receive the Per Share Merger Consideration shall cease to be outstanding and shall automatically be cancelled or retired.

3.      On April 2, 2020, in violation of sections 14(a) and 20(a) of the Exchange Act and their fiduciary duties, the Company filed a Proxy Statement with the SEC on Form PREM14A (the "Proxy"). The Proxy contains numerous material misstatements and omissions. As explained below, the Proxy exposes some details of the highly conflicted sales process, but fails to disclose material facts concerning the Proposed Acquisition – preventing shareholders from casting an informed vote for or against the Proposed Acquisition. For example, the Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process; (b) Meet Group's financial projections; and (c) the data and inputs underlying the financial valuation exercises that purport to support the so-called "fairness opinion" provided by Meet Group's financial advisor, BofA Securities, Inc. ("BofA"). Moreover, review of the Proxy further establishes that the price offered to Meet Group shareholders is inadequate and cannot be supported by a properly prepared valuation of the Company.

4.      In addition to NuCom Group's interest in the Proposed Transaction, the deal may also be tainted by conflicts of interest of the Directors and Company executives.  Notably, certain of the Company's Directors and senior executive officers may have been motivated to enter into the Proposed Transaction in order to receive benefits not shared equally with Plaintiff and members of the Class (defined below).  Under the terms of the Merger Agreement, all illiquid Company options and other incentive awards will vest no later than seven days before the effective date of the Proposed Transaction.

5.      In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duty of candor and duty to maximize shareholder value by, *inter alia*, (i) agreeing to sell to NuCom Group without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or NuCom Group without regard for Meet Group's public shareholders.  Accordingly, this action seeks to enjoin the shareholder vote relating to the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to Meet Group's shareholders.

## **PARTIES**

6.      Plaintiff is a citizen of the United States and the state of California, residing at 1953 Sierra Leone Ave., D, Rowland Heights, CA 91748.  Plaintiff has at all times relevant hereto has been, and continues to be a shareholder of Meet Group common stock.

7.      Defendant Spencer Rhodes ("Rhodes") has been a member of the Board at all relevant times. Rhodes also serves as Chairman of the Board and Nominating and Governance Committee, in addition to being a member on the Investor Relations Committee.

8.      Defendant Geoffrey Cook ("Cook") has been a member of the Board at all relevant times.  Cook also serves as Company's Chief Executive Officer ("CEO").

9.     Defendant Jean Clifton ("Clifton") has been a member of the Board at all relevant times. Clifton also serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

10.     Defendant Christopher Fralic ("Fralic") has been a member of the Board at all relevant times. Fralic also serves as the Chair of the Compensation Committee.

11.     Defendant Keith Richman ("Richman") has been a member of the Board at all relevant times.

12.     Defendant Bedi Singh ("Singh") has been a member of the Board at all relevant times. Singh also serves as the Chair of the Investor Relations Committee and as a member of the Audit Committee.

13.     Defendant Jason Whitt ("Whitt") has been a member of the Board at all relevant times. Whitt also serves as a member of both the Audit and Nominating and Governance Committees.

14.     Defendants named in paragraphs 7 - 13 are referred to herein as "Individual Defendants" or "Director Defendants."

15.     By reason of their positions as officers and/or directors of the Company, the Individual Defendants named above are in a fiduciary relationship with Plaintiff and the other public shareholders of Meet Group and owe them the highest duty of candor and duty to maximize shareholder value, as set forth in further detail herein.

16.     Defendant Meet Group is a Delaware corporation that has its headquarters located at 100 Union Square Drive, New Hope, Pennsylvania 18938.  Meet Group operates a portfolio of mobile social entertainment applications to meet the need for human connection worldwide. The Company is publicly traded on the Nasdaq under the symbol "MEET."

17.     Non-Defendant eHarmony Holding, Inc. is a Delaware corporation and a wholly-owned subsidiary of NuCom Group. NuCom Group is a majority-owned subsidiary of ProSiebenSat.1 Media SE, one of Europe's leading media companies and Germany's biggest TV network. NuCom Group is a private equity investment firm with its portfolio headlined by Parship Group, who recently acquired eHarmony, the online dating website. The company was formed in 2018 and is headquartered in Unterfohring, Germany. ProSiebenSat.1 Media SE is publicly traded on ETR Stock Market under the symbol "PSM."

18.     Non-Defendant Holly Merger Sub, Inc. is a Delaware corporation and a wholly owned subsidiary of eHarmony Holding, Inc.

19.     Non-Defendant NCG - NUCOM GROUP SE, is a European stock corporation and operates solely for the purpose of this agreement.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(e) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

21.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Meet Group's principal place of business is located in this District, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

23.     In any situation where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to act in the best interests of the company's shareholders, including the duty to obtain maximum value under the circumstances. To diligently comply with these duties, the directors may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties; and/or;

(d)     will provide the directors, executives or other insiders with preferential treatment at the expense of, or separate from, the public shareholders, and place their own pecuniary interests above those of the interests of the company and its shareholders.

24.     In accordance with their duty of candor and duty to maximize shareholder value, the Individual Defendants, as directors and/or officers of Meet Group, are obligated to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

5

(b)     participating in any transaction where the directors or officers are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

25.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Plaintiff and the other public shareholders of Meet Group, including their duty of candor and duty to maximize shareholder value.  As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Meet Group common stock in the Proposed Transaction.

26.     As a result of these breaches of fiduciary duty, the Company's public shareholders will not receive adequate or fair value for their common stock in the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Meet Group common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

28.     This action is properly maintainable as a class action because, *inter alia*:

(a)     The Class is so numerous that joinder of all members is impracticable.  Meet Group's stock is publicly traded on the Nasdaq and as of March 6, 2020, there were

over 71 million common shares of Meet Group stock outstanding.  Moreover, the holders of these shares are geographically dispersed throughout the United States;

(b)　　There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  These common questions include, *inter alia*: (i) whether the Individual Defendants have engaged in self-dealing, to the detriment of Meet Group's public shareholders; (ii) whether the Proposed Transaction is unfair to the Class, in that the price is inadequate and is not the fair value that could be obtained under the circumstances; (iii) whether Defendants have violated the federal securities laws; and (iv) whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Transaction is consummated;

(c)　　Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  The claims of Plaintiff are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(d)　　The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other

members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(e)      Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

29.      Meet Group operates a portfolio of mobile social entertainment applications to meet the need for human connection worldwide. The company leverages a live-streaming video platform, empowering community to forge meaningful connections. The company's primary applications include, MeetMe, LOVOO, Skout, Tagged, and Growlr, which keeps mobile daily active users, entertained and engaged, and originate numbers of casual chats, friendships, dates, and marriages. Its applications available on iPhone, Android, iPad, and other tablets in various languages that facilitate interactions among users and encourage users to connect, communicate, and engage with each other. The company also owns and operates meetme.com, skout.com, tagged.com, hi5.com, lovoo.com, and growlrapp.com Websites; and provides online marketing capabilities, which enable marketers to display their advertisements in various formats and in various placements.

30.      On March 11, 2020, the Company announced its 4th Quarter and Year-End Financial Results.  The Company demonstrated exceptional financial success for both the quarter and full-year results. For the 4th Quarter, Meet Group had a total revenue of $57.6 million, up 10% from the prior year quarter, net income of $4.9 million, up from $4.3 million the prior year quarter, Adjusted EBITDA of $13.3 million, compared with $10.6 million in the prior year quarter. In addition to the success of the 4th Quarter results, for the Full-Year 2019 financials, Total revenue

of $211.7 million, up 19% from the prior year, GAAP net income of $11.3 million compared with $1.1 million, and Adjusted EBITDA of $42.2 million, compared with $32.0 million in the prior year.

31.     Defendant Cook commented on these positive results saying, "We are pleased with our results in the fourth quarter, which capped a solid year in which we more than doubled video revenue, launched new growth initiatives and further strengthened our safety leadership through new products and partner collaboration. I am proud of our team and all that we have accomplished."

32.     On October 3, 2019, the Philadelphia Business Journal published an article regarding the Company's 3Q financial results, commenting on the reasons for its success, "The company's live video streaming features have become a central part of its business strategy over the past two years, as it's allowed. The core platform is driven by livestreamers and their viewers, who can purchase digital "gifts" to give to streamers they like. Streamers can then redeem those gifts for cash, with the top percentage of livestreamers earning thousands of dollars a month. On Thursday, the company said it expected Q3 video revenue to be at least $20 million, 5% more than prior expectations."

33.     In addition, The Motley Fool published an article on December 19, 2019 about the Meet Group's financial prospects, saying, "the company has solid fundamentals and has put itself in a good position to diversify revenue streams and keep up with evolving consumer tastes. The social and dating space has exhibited acquisitive behavior in the past, with many larger companies stimulating growth by absorbing newly popular businesses."

34.     Despite this positive outlook and respect amongst the industry, the Proposed Transaction, and the valuation contained therein do not account for Meet Group's proven financial

success. If consummated, the Proposed Transaction would deprive Plaintiff and other members of the Class the true value of their investments.

35.     Nevertheless, on March 5, 2020, Meet Group and NuCom Group jointly issued a press release and filed it with the United States Securities and Exchange Commission ("SEC") wherein it disclosed the entry by Meet Group and NuCom Group into the Merger Agreement.  The joint press release provides, in relevant part, as follows:

> **NEW HOPE, Pa.— March 5, 2020 — The Meet Group, Inc.** (NASDAQ: MEET), a leading portfolio of mobile dating apps, today announced that it has entered into a definitive agreement to be acquired by ProSiebenSat.1`s and General Atlantic's joint company NuCom Group in an all cash transaction for $6.30 per fully diluted share representing an enterprise value of approximately $500 million. Together with NuCom Group's portfolio company Parship Group, a matchmaking platform with its brands Parship, Elite Partner and eharmony, The Meet Group will become an integral part of a global leader in the online dating and social entertainment sector.
>
> After careful and thorough review, and following consultation with The Meet Group's financial and legal advisors, the transaction was unanimously approved by The Meet Group's board of directors. The purchase price represents a 30% and 43% premium to the unaffected 30 and 60 trading day volume weighted average price, respectively, to The Meet Group's common stock through December 13, 2019, the last trading day prior to published market speculation regarding a potential transaction involving the company.
>
> "The Meet Group Board of Directors undertook a robust process, which culminated in a transaction that we believe will deliver certain and immediate value to our shareholders," said Spencer Rhodes, Chairman of The Meet Group Board of Directors. "We are excited about this transaction and the significant benefits resulting from a combination with Parship Group," said Geoff Cook, Chief Executive Officer of The Meet Group. "This transaction will allow us to tap new strategic growth opportunities by leveraging our video platform and ProSiebenSat.1's experience with content and entertainment. What's more, with this transaction and the participation of both General Atlantic and ProSiebenSat.1, we will achieve a new level of financial scale and backing, which has the potential to further accelerate our growth."
>
> The Meet Group's freemium dating brands, featuring its industry-leading video platform technology, will be combined with NuCom's portfolio company Parship Group, which operates premium subscription dating brands including eharmony, Parship and Elite Partner. The transaction will diversify the revenue streams of both

companies and increase their combined international footprint by broadening the companies' user base.

**Max Conze, CEO, ProSiebenSat.1 Media SE**: "The acquisition of The Meet Group is one of ProSiebenSat.1's largest transactions. It will significantly advance our ambition to create one of the leading global players in online dating and interactive live video. We believe the combination of these two successful and complementary businesses will also create synergies within the ProSiebenSat.1 universe and accelerate the growth of our market share in the German live video apps sector."

**Tim Schiffers, CEO Parship Group:** "Following a successful acquisition of eharmony, we have proven that we can manage new businesses and accelerate their growth by combining the best of both worlds. We continue to consolidate our position in the online dating market and extend our business model by adding social entertainment. I am looking forward to working with our new colleagues to solidify our international footprint."

The transaction, which is expected to close in the 2nd half of 2020, is subject to approval by The Meet Group's stockholders, along with the satisfaction of customary closing conditions and regulatory approvals, including the expiration or early termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, antitrust approvals in Germany and Austria as well as approval from the Committee on Foreign Investment in the United States. The Meet Group expects to hold a special meeting of its stockholders to consider and vote on the transaction as soon as feasible after the mailing of the Proxy statement to shareholders.

The Meet Group plans to release its fourth quarter fiscal year 2019 results before market open on March 11, 2020. In light of the pending transaction announced today, the company will not hold a corresponding conference call.

### Representation

BofA Securities is acting as financial advisor to The Meet Group, and Morgan, Lewis & Bockius LLP is acting as legal counsel.

### The Inadequate Merger Consideration

36.     Significantly, the Company's financial prospects and opportunities for future growth, and market presence for NuCom Group establish the inadequacy of the merger consideration. Notably, NuCom Group will receive approximately $500 million in cash on hand from Meet Group.

37.     First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company.  The proposed valuation does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into consideration how the Company is performing, considering the potential the livestreaming dating industry can achieve.

38.     As the Philadelphia Business Journal noted in its March 5, 2020 article about the Proposed Transaction, "the Company's livestreaming platform allows users to buy credits in the app, which they can then use to give their favorite livestreamers digital 'gifts.' Those gifts can then be redeemed for cash. The platform allowed the company to shift its primary revenue source from advertising to user-generated payments, and video soon became a business with an $82 million revenue run rate. Without that bet on livestreaming, Cook said it's fair to say the deal with ProSieben probably wouldn't have happened."

39.     Defendant Cook sees the livestreaming business as a potential powerhouse in the dating industry. In the same article as above, the author commented on Defendant Cook's vision, saying, "Cook saw the success Asian dating app companies had integrating livestreaming into their apps, and thought it could be recreated in Western countries. People often come to their apps to connect with new people, but the downtime between chatting one-on-one with other users leaves a gap that can make users feel even more lonely, he said. Livestreams give them that connection and entertainment, something he described a mix between Tindr and Netflix."

40.     The deal also does not adequately take into consideration the synergies that inure to the benefit of NuCom Group.  As noted in the article above, the Talent Team at Meet Group was a driving factor in the acquisition process: "Cook, along with his brother David and sister Catherine, founded what's now the Meet Group in 2005. David and Catherine were both in high

school and seeking a social media site that helped them meet people they didn't know. At the time, arguably the dawn of the social media age, most companies like MySpace and fledgling Facebook were focused on connecting people who already knew each other. Geoff Cook who founded and sold two startups he created while at Harvard for $10 million, saw the opportunity to stand out in the market and ran with it. Six years after starting myYearbook, the site grew to a user base of 32.7 million and Cook merged it with QuePasa, a similar social media site aimed at Latino populations in Central and South America. The deal was worth $100 million."

41.     Moreover, according to the Reuters article from December 19, 2019 detailing a potential acquisition proposal by NuCom Group, the venture capital firm and media conglomerate wants to expand the software internationally, saying ""We believe the interest in Meet Group likely involves implementing Meet Group's live streaming platforms across NuCom's various dating sites, as well as potential user overlaps in Europe and Germany." The Proposed Transaction clearly does not take the Company's potential success and reach into its proposal.

42.     Clearly, while the deal will be beneficial to NuCom Group, it comes at great expense to Plaintiff and other public stockholders of the Company.

43.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for NuCom Group at the expense of Meet Group's public stockholders, which clearly indicates that Meet Group's stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

44.     The Merger Agreement contains certain provisions that unduly benefit NuCom Group by making an alternative transaction either prohibitively expensive or otherwise impossible. Here, for example, the Merger Agreement contains a termination fee provision that requires Meet

Group to pay NuCom Group an amount equal to $18,631,945 if the Merger Agreement is terminated under certain circumstances.

45.     The termination fee payable under this provision will make the Company that much more expensive to acquire for potential purchasers, while resulting in a corresponding decline in the amount of consideration payable to Meet Group's shareholders.

46.     The Merger Agreement also contains a "No Solicitation of Transactions" provision that restricts Meet Group from considering alternative acquisition proposals by, *inter alia*, constraining Meet Group's ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the provision prohibits Meet Group from soliciting any alternative proposal, but permits the Board to consider an ***unsolicited*** "Competing Company Transaction" only if it constitutes or is reasonably calculated to lead to a "Superior Proposal" as defined in the Merger Agreement.  However, even the Board's consideration of unsolicited proposal is restricted: prior to considering any such proposal, the Board must determine, in consultation with its financial advisors, that its fiduciary duties *require* it to consider the proposal.  Thus, the Board cannot consider alternative proposals even if it reasonably believes that any such proposal would be beneficial to shareholders.

47.     Further, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, Defendants agreed to provide NuCom Group information in order to match any other offer, thus providing NuCom Group access to the unsolicited bidder's financial information and giving NuCom Group the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of NuCom Group.

48.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

*Conflicts of Interest*

49.     Pursuant to the Merger Agreement, as a consequence of the merger, each outstanding and unvested Company option and/or restricted stock will automatically vest and/or be converted into the right to receive cash or stock in certain amounts.  As a result, the Individual Defendants will receive immediate lump sum cash payments in exchange for their (collective) thousands of currently illiquid Meet Group options and restricted stock as follows:

| Name | Cash ($)(1) | Equity ($)(2) | Total ($)(3) |
|---|---|---|---|
| Geoff Cook | 1,592,576 | 10,409,688 | 12,002,264 |
| James Bugden | 622,292 | 2,733,277 | 3,355,569 |
| Frederic Beckley | 616,172 | 3,594,975 | 4,211,147 |
| Michael Johnson | 387,072 | 857,590 | 1,244,662 |

50.     In addition, pursuant to the Merger Agreement, as a consequence of the merger, each outstanding and unvested Company option and/or restricted stock will automatically vest and/or be converted into the right to receive cash or stock in certain amounts.  As a result, the Individual Defendants will receive immediate lump sum cash payments in exchange for their (collective) thousands of currently illiquid Meet Group options and restricted stock.

51.     Clearly, based on the above, the Proposed Transaction is the product of an unfair and inadequate sales process conducted by the Board and Company insiders with an eye to personal compensation and in breach of its fiduciary duties and which fails to maximizer stockholder value.

*The Materially Incomplete and Misleading Proxy Statement*

52.     On April 2, 2020, Meet Group filed with the SEC a materially misleading and incomplete Proxy Statement that, in violation their fiduciary duties, failed to provide the

Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

53.     The Proxy Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Proxy Statement fails to disclose whether the confidentiality agreement entered into between the Company and the private equity sponsor for Company B contained a standstill provision and, if so, whether such standstill provision (i) contained a "Don't ask, Don't waive" ("DADW") provision and (ii) whether such provision remains in effect.

*Omissions and/or Material Misrepresentations Concerning Meet Group's Financial Projections*

54.     The Proxy Statement fails to provide material information concerning financial projections provided by Meet Group management and relied upon by BofA in its analyses.  The Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.

55.     The Proxy Statement indicates that in connection with the rendering of BofA's fairness opinion, BofA reviewed, "reviewed certain internal financial and operating information with respect to the business, operations and prospects of the Company furnished to or discussed with BofA Securities by the management of the Company, including certain financial forecasts relating to the Company prepared by the management of the Company, referred to herein as the Company management forecasts."

56. Accordingly, the Proxy Statement should have, but fails to provide, certain information in the projections that Meet Group management provided to the Board and BofA. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

57. The Proxy Statement fails to provide material information concerning the financial projections prepared by Meet Group management. While the Proxy Statement provides certain line items for Adjusted EBITDA, it fails to disclose material line items for the Non-GAAP measures, including (i) interest expense, (ii) stock-based compensation, (iii) non-recurring expense and (iv) restructuring or other expenses.

58. Additionally, the Proxy Statement fails to disclose a reconciliation of all provided non-GAAP metrics, including Adjusted EBITDA and Unlevered Free Cash Flow ("UFCF") to GAAP metrics.

59. This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

60. Without accurate projection data presented in the Proxy Statement, Plaintiff and other stockholders of Meet Group are unable to properly evaluate the Company's true worth, the accuracy of BofA's financial analyses, or make an informed decision whether to vote their

Company stock in favor of the Proposed Transaction. As such, the Board has breached their fiduciary duties by failing to include such information in the Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by BofA*

61.     In the Proxy Statement, BofA describes its respective fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

62.     With respect to the *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose the following:

(a)     The specific inputs and assumptions used to calculate the discount rate range of 7.5% to 10.0% used;

(b)     The specific inputs and assumptions underlying the assumed effective tax rate of 21% and discount rates ranging from 7.0% to 9.0% used to calculate implied per share present value of tax benefits estimated to result from net operating losses ("NOL");

(c)     The projected terminal values;

(d)     Inputs and assumptions underlying the terminal multiples 8.0x to 10.0x; and

(e)     Inputs and assumptions underlying the assumed perpetuity growth rates of 1.9% to 5.3%.

63.     These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

64.     With respect to the *Selected Publicly Traded Companies Analysis*, the Proxy Statement fails to disclose the individual multiples observed for each of the selected companies.

65.     With respect to the *Selected Precedent Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples observed for each of the selected transactions.

66.     Without the omitted information identified above, Meet Group' public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Meet Group' public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.  As such, the Board has breached their fiduciary duties by failing to include such information in the Proxy Statement.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty against the Individual Defendants

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.     As alleged herein, Defendants have initiated a process to sell Meet Group that undervalues the Company and vests them with benefits that are not shared equally by Meet Group's public shareholders.  In addition, by agreeing to the Proposed Transaction, Defendants have capped the price of Meet Group at a price that does not adequately reflect the Company's true value.  Moreover, Defendants failed to sufficiently inform themselves of Meet Group's value, or disregarded the true value of the Company, in an effort to benefit themselves.  Furthermore, any alternate acquirer will be faced with engaging in discussions with a management team and board that is committed to the Proposed Transaction.

69.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiff and the other members of the Class, and will further a process that inhibits the maximization of shareholder value and the disclosure of material information.

70.     Plaintiff and the members of the Class have no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duties against Meet Group

71.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.     Defendant Meet Group is sued herein as an aider and abettor of the breaches of fiduciary duties outlined above by the Individual Defendants, as members of the Board of Meet Group.

73.     The Individual Defendants have breached their fiduciary duties in the manner described herein.  Such breaches could not and would not have occurred but for the conduct of Defendant Meet Group.

74.     Defendant Meet Group had knowledge that it was aiding and abetting the Individual Defendants' breach of fiduciary duties to Meet Group stockholders.

75.     Defendant Meet Group rendered substantial assistance to the Individual Defendants in the breach of their fiduciary duties to Meet Group stockholders.

76.     As a result of these Defendants' conduct of aiding and abetting the Individual Defendants' breaches of fiduciary duties, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

77.     As a result of the unlawful actions of Defendants, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive fair value for Meet Group's assets and business and will be prevented from obtaining the real value of their equity ownership in the Company.

78.     Unless the actions of these Defendants are enjoined by the Court, they will continue to aid and abet the Individual Defendants' breach of their fiduciary duties owed to Plaintiff and the members of the Class, and will aid and abet a process that inhibits the maximization of shareholder value.

79.     Plaintiff and the members of the Class have no adequate remedy at law.

### THIRD CAUSE OF ACTION

**Violations of Section 14(a) of the Exchange Act
Against All Defendants**

80.     Plaintiff repeats all previous allegations as if set forth in full herein.

81.     Defendants have disseminated the Proxy with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

82.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

83.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication,

written or oral, containing any statement which, at the time and in the light
of the circumstances under which it is made, is false or misleading with
respect to any material fact, or which omits to state any material fact
necessary in order to make the statements therein not false or misleading or
necessary to correct any statement in any earlier communication with
respect to the solicitation of a proxy for the same meeting or subject matter
which has become false or misleading.

84.     The Proxy was prepared in violation of Section 14(a) because it is materially

misleading in numerous respects and omits material facts, including those set forth above.

Moreover, in the exercise of reasonable care, Defendants knew or should have known that the

Proxy is materially misleading and omits material facts that are necessary to render them non-

misleading.

85.     The Individual Defendants had actual knowledge or should have known of the

misrepresentations and omissions of material facts set forth herein.

86.     The Individual Defendants were at least negligent in filing a Proxy that was

materially misleading and/or omitted material facts necessary to make the Proxy not misleading.

87.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the

Class, and Plaintiff and the Class will be deprived of its entitlement to decide whether to vote its

shares in favor of the Proposed Transaction on the basis of complete information if such

misrepresentations and omissions are not corrected prior to the stockholder vote regarding the

Proposed Transaction.

## FOURTH CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act
### Against The Individual Defendants

88.     Plaintiff repeats all previous allegations as if set forth in full herein.

89.     The Individual Defendants were privy to non-public information concerning the

Company and its business and operations via access to internal corporate documents, conversations

and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Proxy was materially misleading to Company stockholders.

90.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Proxy and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Proxy.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Proxy before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

91.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Meet Group's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Proxy was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Proxy and are therefore responsible and liable for the misrepresentations contained herein.

92.     The Individual Defendants acted as controlling persons of Meet Group within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Meet Group to engage in the wrongful

conduct complained of herein. The Individual Defendants controlled Meet Group and all of its employees. As alleged above, Meet group is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.      Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as class counsel;

B.      Temporarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction;

C.      To the extent the Proposed Transaction is consummated before entry of this Court's judgment, rescinding it and setting it aside or awarding rescissory damages;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

E.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff prays for a jury trial on all issues and in all proceedings so triable.

Dated: April 30, 2020                          Respectfully submitted,

**BRODSKY & SMITH, LLC**
Marc L. Ackerman (PA Bar No. 56294)

24

Ryan P. Cardona (Pa Bar No. 316350)
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
Tel: (610) 667-6200
Fax: (610) 667-9029
mackerman@brodskysmith.com
rcardona@brodskysmith.com

*Attorneys for Plaintiff*